UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

DISABILITY RIGHTS NEW YORK,

                Plaintiff,

v.                                                                              1:16-CV-0176
                                                                                (GTS/CFH)
NORTHERN RIVERS FAMILY SERVICES, INC.;
JOHN HENLEY, in His Official Capacity as Chief
Executive Officer of Northern Rivers Family
Services; and NORTHEAST PARENT AND CHILD
SOCIETY,

                Defendants.
_____

APPEARANCES:                                            OF COUNSEL:

DISABILITY RIGHTS OF NEW YORK                CLIFF ZUCKER, ESQ.
  Counsel for Plaintiff                                   JENNIFER J. MONTHIE, ESQ.
725 Broadway, Suite 450                               JULIE MICHAELS KEEGAN,
ESQ.
Albany, NY 12207                                          MICHAEL W. GADOMSKI, ESQ.

BURKE, SCOLAMIERO, MORTATI & HURD, LLP     PETER M. SCOLAMIERO, ESQ.
  Counsel for Defendants Northern Rivers Family
  Services, Inc., and Northeast Parent and Child Society
7 Washington Square
Albany, NY 12205

LaFAVE, WEIN & FRAMENT, PLLC                   PAUL H. WEIN, ESQ.
  Counsel for Defendant John Henley
2400 Western Avenue
Guilderland, NY 12084

GLENN T. SUDDABY, Chief United States District Judge

**<u>DECISION and ORDER</u>**

Currently pending before the Court, in this civil rights action for declaratory and injunctive relief filed by Disability Rights New York ("Plaintiff") against the above-captioned individual and two entities ("Defendants"), are (1) Plaintiff's motion for an Order preliminarily enjoining Defendants from denying Plaintiff access to Defendants' facility and residents for purposes of investigation and monitoring pursuant to Fed. R. Civ. P. 65, (2) the cross-motion of the individual ("Individual Defendant") to dismiss Plaintiff's Complaint for failure to state a claim upon which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6), and (3) the motion of the two entities ("Entity Defendants") to dismiss Plaintiff's Complaint for failure to state a claim upon which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6). (Dkt. Nos. 4, 16, 28.) For the reasons set forth below, Plaintiff's motion is granted, the Individual Defendant's cross-motion is denied, and the Entity Defendants' motion is denied.

# I.     RELEVANT BACKGROUND

## A.     Plaintiff's Complaint

Generally, Plaintiff's Complaint alleges as follows. Between June 15, 2014, and January 7, 2015, at a residential treatment center in Schenectady, New York, called "the Children's Home" (which is operated by Northeast Parent and Child Society, whose parent organization is Northern Rivers Family Services), staff members physically abused and neglected two individuals with disabilities–R.W. and T.H.–who resided there. (Dkt. No. 1.) Subsequently, the individuals became clients of Plaintiff, the federally authorized statewide protection and advocacy agency designated by the Governor of New York State to protect and advocate for persons with disabilities. (*Id.*) On May 1, 2015, Plaintiff sent Defendants a letter requesting the

treatment records of R.W. and T.H. and physical access to the Children's Home to investigate the incidents of abuse and neglect and monitor the health and safety of residents (subsequently providing information requested by Defendants). (*Id*.) However, on May 29, 2015, Defendants sent Plaintiff a letter denying that request. (*Id*.)

Generally, based on these factual allegations, Plaintiff's Complaint asserts three claims against Defendants: (1) a claim that Defendants violated the Developmental Disabilities Assistance and Bill of Rights Act of 2000 ("DD Act"), 42 U.S.C. § 15041 *et seq*., and its implementing regulations; (2) a claim that Defendants violated the Protection and Advocacy for Individuals with Mental Illness Act of 1986 ("PAIMI Act"), 42 U.S.C. § 10801 *et seq*., and its implementing regulations; and (3) a claim that Defendants violated the Protection and Advocacy of Individual Rights Act ("PAIR Act"), 29 U.S.C. § 794e. (*Id*.)

Generally, as relief, the Complaint requests the following: (1) a declaratory judgment that Defendants have violated Plaintiff's rights under the DD Act, PAIMI Act, and PAIR Act; (2) a preliminary and thereafter permanent injunction ordering Defendants to provide Plaintiff with copies of all records requested pursuant to its federally mandated protection-and-advocacy authority; (3) a preliminary and thereafter permanent injunction ordering Defendants to provide Plaintiff with access to their facilities pursuant to its federally mandated protection-and-advocacy authority; and (4) an Order retaining jurisdiction over this action to ensure Defendants' compliance with the mandates of the DD Act, the PAIMI Act, and the PAIR Act. (*Id*.)

Familiarity with these claims, the factual allegations supporting them, and the forms of relief requested is assumed in this Decision and Order, which is intended primarily for the review of the parties. (*Id*.)

**B.      Parties' Briefing on Plaintiff's Motion for a Preliminary Injunction**

**1.      Plaintiff's Memorandum of Law**

Generally, in support of its motion for preliminary injunction, Plaintiff argues as follows: (1) Plaintiff is likely to succeed on the merits of its claims, because the DD Act, the PAIMI Act, and the PAIR Act authorize Plaintiff to access public and private service providers or facilities, including residential treatment centers that provide services to individuals with developmental disabilities, mental illness, and other disabilities; (2) Plaintiff will suffer irreparable harm without the Court's intervention, because multiple incidents of abuse and neglect have been reported to Plaintiff, and federal courts have long held the denial of a protection-and-advocacy system's access authority causes it irreparable harm; (3) the balance of hardships weighs heavily in favor of Plaintiff, because it will suffer a hardship by not being able to fulfill its statutory duty in a timely fashion (i.e., before witnesses become unavailable, or other residents are abused or neglected), and Defendants cannot be fairly said to suffer a "hardship" by being subjected to an abuse-or-neglect investigation (and indeed they will benefit from the correction of any issues regarding abuse or neglect); and (4) the public interest is advanced by the provision of preliminary relief, because the public has an interest in ensuring that individuals with disabilities receiving services licensed by the state are free from abuse and neglect.  (*See generally* Dkt. No. 4, Attach. 5 [Plf.'s Memo. of Law].)

**2.      Defendants' Opposition Memorandum of Law**

Generally, in their response, Defendants argue as follows: (1) Plaintiff is not likely to succeed on the merits of its claims, because it sets forth no evidence that the Children's Home (which cares for children who come from a family that is either homeless or broken, and which

is licensed by the Office of Children and Family Services, not the Office of Mental Health or the Office for People With Developmental Disabilities) houses children who suffer from a disability or mental illness; (2) Plaintiff will not suffer irreparable harm in the absence of an injunction, because (a) R.W. and T.H. left the Children's Home a year ago, (b) the Children's Home has already terminated the two employees involved in the incident that took place on June 15, 2014, (c) Plaintiff points to no information that it would be able to uncover now that it would not be able to discover after the issues have been litigated, and (d) there is already pending, in this District, a separate lawsuit based on the allegations regarding R.W. (*R.W. v. Northern Rivers Family Servs., Inc.*, 15-CV-1167-GLS/DEP [N.D.N.Y. filed Sept. 28, 2015]), enabling Plaintiff to obtain all of the information it needs regarding R.W. through discovery in that lawsuit; (3) the balance of hardships does not tip in Plaintiff's favor, because (a) denying the motion will not deprive Plaintiff of any information to which it does not already have access (due to the several investigations that have already been conducted by multiple regulatory agencies regarding the allegations of abuse at issue), and (b) granting the motion will subject Defendants to a useless search by Plaintiff, who does not have jurisdiction over Defendants; and (4) the public interest is not served by the issuance of an injunction, because (a) Defendants have already taken remedial action based on the findings of the investigations by the other regulatory entities, and (b) it is a waste of resources to permit another search (especially by an entity without jurisdiction). (*See generally* Dkt. No. 16, Attach. 2 [Def. Entities' Opp'n Memo. of Law]; Dkt. No. 14 [Affid. of Def. Henley's Counsel].)

### 3.     Plaintiff's Reply Memorandum of Law

Generally, in its reply, Plaintiff argues as follows: (1) because the second, third and fourth arguments asserted by Defendants in opposition to Plaintiff's motion have already been addressed in Plaintiff's moving papers, they will not be addressed again in Plaintiff's reply papers; (2) with regard to the first argument asserted by Defendants in opposition to Plaintiff's motion (i.e., that Plaintiff is not likely to succeed on the merits of its claims), Plaintiff is likely to succeed on the merits of its claims, because (a) Plaintiff has jurisdiction over Defendants pursuant to state and federal law, (b) the Children's Home is a facility and service provider subject to the authority of Plaintiff, (c) Plaintiff does not need to prove that the subject of its Complaint has a mental illness or developmental disability to obtain access to a service provider, and (d) Defendants did not comply with federal law in rejecting the release-of-records authorizations provided by Plaintiff in May of 2015.  (*See generally* Dkt. No. 19 [Plf.'s Reply Memo. of Law].)

### 4.     Hearing on Plaintiff's Motion for a Preliminary Injunction

Generally, at the hearing on Plaintiff's motion, evidence was adduced by Plaintiff, and arguments were offered by both Plaintiff and Defendants.  (Dkt. No. 25; Text Minute Entry dated March 8, 2016.)  Among those arguments was the argument that Plaintiff's motion should be denied for the additional reason that the authorizations provided by Plaintiff in May of 2014 were not compliant with the Health Insurance Portability and Accountability Act ("HIPAA").  (Hrg. Tr. at 16, 53-56, 70-72, 88, 95-97.)

**C.     Parties' Briefing on the Individual Defendant's Cross-Motion to Dismiss**

**1.     Individual Defendant's Memoranda of Law**

Generally, in support of his cross-motion to dismiss, the Individual Defendant asserts four arguments: (1) the Complaint must be dismissed because it does not allege facts plausibly suggesting that the Children's Home provides care, or has provided care, to anyone with a mental illness or disability; (2) even if adequately pled, the Complaint must be dismissed because Plaintiff (which is the direct successor to the New York State Commission on Quality of Care and Advocacy for Persons with Disability, whose jurisdiction was limited to the facilities licensed by the state agencies operating under its auspices, including the Office of People with Developmental Disabilities or the Office of Mental Health) does not have jurisdiction over the Children's Home, which does not fit under any of the statutory definitions that would subject it to the regulations of either the New York State Office of People with Developmental Disabilities or the New York State Office of Mental Health under New York State law; (3) the Complaint must be dismissed to the extent it requests the release of records because it does not allege facts plausibly suggesting that R.W. or T.H. are clients of Plaintiff, that their respective mothers were guardians or still maintain parental rights (for purposes of HIPAA), or that either R.W. or T.H. was a resident of the Children's Home at the time the request for access and records was sent; and (4) the Complaint must be dismissed as to John Henley because (a) it cites no authority under New York State law that allows for him to be named as an individual defendant in this action, and (b) it does not allege any act or omission by him that would cause him to be a named party in this action.   (*See generally* Dkt. No. 16, Attach. 2 [Def. Entities' Opp'n Memo. of Law].)

## 2.     Plaintiff's Opposition Memorandum of Law

Generally, in its response, Plaintiff asserts four arguments: (1) Plaintiff has broad jurisdiction over Defendants pursuant to the DD Act, the PAIMI Act, and the PAIR Act, and N.Y. Executive Law § 558 (which extends Plaintiff's access to locations defined by federal law and well beyond the limits of New York State Mental Hygiene Law) does not narrow that broad jurisdiction; (2) the Children's Home is a "facility" and "service provider" within the meaning of the P & A statutes and regulations, because (a) under the PAIMI Act regulations, a "facility" includes private residential settings that provide overnight "care or treatment," which term is broadly defined and describes some of the services provided by the Children's Home, and (b) under the DD Act and its regulations, the term "service provider" is similarly broad and encompasses the Children's Home; (3) Plaintiff does not need to allege facts plausibly suggesting that the subject of a Complaint has a mental illness or developmental disability to obtain access to a service provider, because courts have consistently held that P & A systems need not make a

"threshold showing" of mental illness or developmental disability in order to exercise P & A access authority, and in any event Plaintiff has alleged such facts, and Defendants do not deny knowing those facts; and (4) Defendants did not comply with federal law in rejecting the access authorizations provided by Plaintiff, because Defendants can demand from a P & A system an authorization only after it has provided the P & A system with (a) a written statement of the reasons for their denial or delay of access and (b) the name of that legal guardian, conservator or other legal representation.  (*See generally* Dkt. No. 19 [Plf.'s Reply Memo. of Law].)

### D. Parties' Briefing on Entity Defendants' Motions to Dismiss

#### 1. Entity Defendants' Memoranda of Law

The Entity Defendants' memorandum of law incorporates by reference the substance of the Individual Defendant's memorandum of law. (Dkt. No. 28, Attach. 2 [Entity Defs.' Memo. of Law].)[1]

#### 2. Plaintiff's Opposition Memorandum of Law

Generally, in its response, Plaintiff asserts six arguments: (1) the Complaint has sufficiently pled that Defendants are providing services to persons with disabilities, because (a) it alleges that the Children's Home "provides care and treatment to youth with psychiatric, psychological and behavioral issues," (b) it references Plaintiff's letter to Defendants dated August 17, 2015, which reference R.W.'s educational disability and mental illness, T.H.'s mental illness, and the Children's Home mental-illness and developmental-disability program description, and (c) the Court may take judicial notice of statements made on the Children's Home current website; (2) the Complaint has sufficiently pled that R.W. and T.H. are persons with disabilities by (a) alleging that "R.W. is an individual with a disability" and that "T.H. is an individual with a disability," and (b) referencing Plaintiff's aforementioned letter to Defendants dated August 17, 2015; (3) Plaintiff has authority to access the Children's Home because it is

---

[1] For the sake of brevity, the Court will not decide the issue of whether the Entity Defendants' motion should have been filed as a cross-motion (along with its response to Plaintiff's motion, which was due on March 8, 2016) given that, under Local Rule 7.1(c), the Entity Defendants' motion arguably "compet[es]" with Plaintiff's motion for a preliminary injunction arguing (specifically, the portion of Plaintiff's motion arguing that its Complaint has facial merit sufficient to warrant the awarding of preliminary injunctive relief). Rather, the Court will note merely that, under the circumstances, the Entity Defendants' motion and the Individual Defendant's motion must be both cross-motions or motions. The Court notes also that the Individual Defendant's cross-motion purported to be filed on behalf of *all* Defendants. (Dkt. No. 16, Attach. 2.)

both a "service provider" (under the DD Act, whose implementing regulations purposefully do not define the term in order to provide "flexibility" to the P & A system) and a "facility" (under N.Y. Exec. Law § 558 and the P & A Acts), and in any event the Supremacy Clause would nullify any state law purporting to define it otherwise; (4) the Complaint has sufficiently pled that Plaintiff obtained record releases from the mothers of R.W. and T.H., because (a) it alleges that "DRNY's letter [of May 1, 2015] attached two authorizations, one signed by T.H.'s legal guardian and the other signed by R.W.'s legal guardian, permitting DRNY to access our clients' records," and (b) the implementing regulations of the DD Act and the PAIMI Act clearly provide that any service provider or facility denying a P & A system access to records due to an alleged lack of authorization shall provide the name, address and telephone number of the legal guardian, conservator, or other legal representative of an individual with a developmental disability or mental illness; (5) Defendant John Henley is an appropriately named party in this action, because (a) if the Court were to issue injunctive and declaratory relief in favor of Plaintiff, then Defendant John Henley, and his successors as chief executive officer, must be included in any order to ensure full compliance with the Court's Order, and (b) the districts courts in *Wisconsin Coal. for Advocacy, Inc. v. Czaplewski*, 131 F. Supp. 2d 1039, 1052 (E.D. Wis. 2001), and *Ohio Legal Rights Serv. v. Buckeye Ranch, Inc.*, 365 F. Supp. 2d 877, 879, 892-93 (S.D. Ohio 2005), ordered injunctive or declaratory relief against the administrators of agencies that had denied P & As access to records and facilities; and (6) Plaintiff has established its entitlement to a preliminary injunction.  (*See generally* Dkt. No. 31 [Plf.'s Opp'n Memo. of Law].)

### 3. Entity Defendants' Reply Memorandum of Law

Generally, in their rely, the Entity Defendants assert three arguments: (1) Plaintiff has not sufficiently pled that the Children's Home treats disabled or mentally ill children, because (a) Plaintiff's Complaint is bereft of factual allegations plausibly suggesting any developmental disabilities or mental illness, or treatment therefore, at the Children's Home, and (b) the cases cited by Plaintiff are distinguishable from the current case; (2) Plaintiff has not sufficiently pled that R.W. and T.H. suffered from a developmental disability or mental illness while they resided at the Children's Home, because the allegations in Plaintiff's letter to Defendants dated August 17, 2015, do not plausibly suggest such a fact; and (3) documents introduced in support of Plaintiff's motion for a preliminary injunction cannot be considered on this motion and, even if they can be, they are not sufficient to save Plaintiff's Complaint under *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). (*See generally* Dkt. No. 32 [Entity Defs.' Memo. of Law].)

## II. GOVERNING LEGAL STANDARDS

### A. Legal Standard Governing a Motion for a Preliminary Injunction

Generally, a party seeking a preliminary injunction pursuant to Fed. R. Civ. P. 65 must demonstrate the following four elements: (1) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation plus a balance of hardships tipping decidedly in the movant's favor; (2) a likelihood of irreparable injury in the absence of an injunction; (3) that the balance of hardships tips in the movant's favor (regardless of the likelihood of success); and (4) that the public interest would not be disserved by the issuance of an injunction. *Benihana Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 895 (2d Cir. 2015) (citing *Salinger v. Colting*, 607 F.3d 68, 79-80 [2d Cir. 2010]

[reformulating standard in light of *Winter v. Nat. Res. Def. Council*, 555 U.S. (2008)]); *accord, Gen. Mills, Inc. v. Chobani, LLC*, 16-CV-0058, 2016 WL 356039, at *4-5 (N.D.N.Y. Jan. 29, 2016) (Hurd, J.) (tracing the recent reformulation of the traditional test for such motions).

Because the parties have demonstrated (in their memoranda of law) an adequate understanding of this legal standard, the Court need not, and does not, further elaborate on this legal standard in this Decision and Order, which is intended primarily for the review of the parties.

**B.     Legal Standard Governing a Motion to Dismiss for Failure to State a Claim**

For the sake of brevity, the Court will not recite, in this Decision and Order, the well-known legal standard governing dismissals for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6), but will direct the reader to the Court's decision in *Wade v. Tiffin Motorhomes, Inc.*, 05-CV-1458, 2009 WL 3629674, at *3-5 (N.D.N.Y. Oct. 27, 2009) (Suddaby, J.), which accurately recites that legal standard.  To that legal standard, the Court would add only one point.

Generally, when contemplating a dismissal pursuant to Fed. R. Civ. P. 12(b)(6), the following matters outside the four corners of the complaint may be considered without triggering the standard governing a motion for summary judgment: (1) documents attached as an exhibit to the complaint or answer, (2) documents incorporated by reference in the complaint (and provided by the parties), (3) documents that, although not incorporated by reference, are "integral" to the complaint, or (4) any matter of which the court can take judicial notice for the factual background of the case.[2]

---

[2]        *See* Fed. R. Civ. P. 10(c) ("A copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes."); *L-7 Designs, Inc. v. Old Navy, LLC*, No. 10-

## III.   ANALYSIS

Because the granting of Defendants' cross-motion and motion to dismiss for failure to state a claim would preclude the Court's consideration of Plaintiff's motion for a preliminary injunction, the Court will consider Defendants' cross-motion and motion before considering Plaintiff's motion.[3]

---

573, 2011 WL 2135734, at *1 (2d Cir. June 1, 2011) (explaining that conversion from a motion to dismiss for failure to state a claim to a motion for summary judgment is not necessary under Fed. R. Civ. P. 12[d] if the "matters outside the pleadings" in consist of [1] documents attached to the complaint or answer, [2] documents incorporated by reference in the complaint (and provided by the parties), [3] documents that, although not incorporated by reference, are "integral" to the complaint, or [4] any matter of which the court can take judicial notice for the factual background of the case); *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (explaining that a district court considering a dismissal pursuant to Fed. R. Civ. 12(b)(6) "may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint. . . . Where a document is not incorporated by reference, the court may neverless consider it where the complaint relies heavily upon its terms and effect, thereby rendering the document 'integral' to the complaint. . . . However, even if a document is 'integral' to the complaint, it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document. It must also be clear that there exist no material disputed issues of fact regarding the relevance of the document.") [internal quotation marks and citations omitted]; *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2009) ("The complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference.") (internal quotation marks and citations omitted); *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir.1995) (per curiam) ("[W]hen a plaintiff chooses not to attach to the complaint or incorporate by reference a [document] upon which it solely relies and which is integral to the complaint," the court may nevertheless take the document into consideration in deciding [a] defendant's motion to dismiss, without converting the proceeding to one for summary judgment.") (internal quotation marks and citation omitted).

   [3]      *See, e.g., Woodson v. Colajezzi*, 12-CV-0973, 2012 WL 4932022, at *4 (E.D. Pa. Oct. 16, 2012) ("The Complaint's failure to state a claim upon which relief can be granted necessarily precludes a finding that Plaintiff has demonstrated a likelihood of success on the merits, which is required before a court may grant preliminary injunctive relief."), *appeal dismissed*, 573 F. App'x 204, 204 (3d Cir. 2014) ("The District Court also denied Woodson's motion for a preliminary injunction because his failure to state a claim upon which relief can be granted necessarily precluded a finding that he had demonstrated a likelihood of success on the merits, which is required before a court may grant preliminary injunctive relief.") (internal quotation marks omitted); *Winkels v. Morales*, 10-CV-0076, 2011 WL 1226220, at *5, n.5 (S.D.

**A.    Analysis of the Individual Defendant's Cross-Motion to Dismiss and the Entity Defendants' Motion to Dismiss**

After carefully considering the matter, the Court denies the Individual Defendant's cross-motion to dismiss the Entity Defendants' motion to dismiss for the reasons stated in Plaintiff's opposition memoranda of law.  *See, supra,* Parts I.C.2., and I.D.2. of this Decision and Order. To those reasons, the Court adds the following five points.

First, the Court rejects the bulk of Plaintiff's argument that its Complaint does not need to allege facts plausibly suggesting that the subject of a Complaint has a mental illness or developmental disability to obtain access to a service provider, for the reasons set forth below in Parts III.B.1.a., III.B.1.b., and III.B.1.c. of this Decision and Order.  Rather, under the circumstances, the Complaint must allege facts plausibly suggesting that (a) substantial evidence exists that the Children's Home recently offered or currently offers assistance to individuals who are developmentally disabled and/or mentally ill (for purposes of Plaintiff's monitoring request), and (b) substantial evidence exists that the Children's Home offered such assistance when the alleged incident(s) of abuse and neglect occurred (for purposes of Plaintiff's records-access request).

Second, with regard to Plaintiff's argument that the Children's Home is both a "service provider" and "facility," the Court rejects Plaintiff's Supremacy Clause argument and its argument in favor of a carte blanche interpretation of the term "service provider."  However, the Court finds that the Children's Home falls within the definition of the terms "service provider" and "facility" under all of the relevant statutes and regulations.

Ga. March 1, 2011) ("Plaintiff's failure to state a claim against Defendant Henderson for invasion of bodily privacy or sexual abuse also precludes any of the injunctive relief requested regarding Defendant Henderson . . . .").

Third, to the extent that Defendants argue that the Complaint does not allege facts plausibly suggesting that T.H. and R.W. are or were individuals with a mental illness or developmental disability, that argument is well taken. Plaintiff's Complaint is hardly a model of fair notice, and in the future Plaintiff would be well advised to observe the requirements of *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955 (2007), by alleging facts plausibly suggesting a mental illness or developmental disability.[4] However, the present motion to dismiss comes to the Court coupled with a motion for a preliminary injunction, pursuant to which Plaintiff has adduced numerous documents. (*See generally* Hrg. Exs.) The issue, then, becomes whether the Court may construe any of those documents for purposes of the Individual Defendants' cross-motion to dismiss and the Entity Defendants' motion to dismiss without converting them into ones for summary judgment.

Applying the legal standard set forth above in Part II.B. of this Decision and Order (governing what documents may be considered on a motion to dismiss for failure to state a claim), the Court finds that R.W.'s Individualized Education Program at the House of the Good Shepherd resulting from a meeting on May 13, 2015, and his Individualized Treatment Plan at the House of the Good Shepherd dated April 22, 2015, may be considered for purposes of a Fed. R. Civ. P. 12(b)(6) analysis, because they are *integral* to the Complaint (and no dispute exists regarding its authenticity or accuracy).

---

[4]     For example, Plaintiff is advised that its conclusory allegations that "R.W. is an individual with a disability . . . under the DD Act, PAIMI Act, and PAIR Act" and that "T.H. is an individual with a disability as defined by the DD Act, PAIMI Act, and PAIR Act," by themselves, are not sufficient. (Dkt. No. 1, at ¶¶ 44, 50 [Plf.'s Compl.].) Plaintiff is also advised that the Court rejects Plaintiff's judicial-notice argument because of (1) the ambiguous and/or vague nature of many of the asserted statements in question, and (2) the lack of indication that the Children's Home's website made similar statements during the time in question.

To be "integral" to a complaint, a document must (1) be a thing of which the plaintiff had *actual notice*, and (2) be a thing whose *terms and effect* were *heavily relied* on by the plaintiff in framing the complaint. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) ("Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, which renders the document integral to the complaint. . . [G]enerally, the harm to the plaintiff when a court considers material extraneous to a complaint is the lack of notice that the material may be considered. . . . Accordingly, where plaintiff has actual notice of all the information in the movant's papers and has relied upon these documents in framing the complaint the necessity of translating a Rule 12(b)(6) motion into one under Rule 56 is largely dissipated.") (internal quotation marks and citation omitted); *accord, L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011).

Here, R.W.'s Individualized Education Program at the House of the Good Shepherd resulting from a meeting on May 13, 2015, and his Individualized Treatment Plan at the House of the Good Shepherd dated April 22, 2015, are the sole pieces of evidence on which Plaintiff relies in Paragraphs 64 and 65 of its Complaint to support its prior allegation, in Paragraph 44, that R.W. is an individual with a disability as defined by the DD Act, the PAIMI Act and the PAIR Act. (*Compare* Dkt. No. 1, at ¶¶ 44, 64, 65 [Plf.'s Compl., alleging that R.W. is an individual with a disability as defined by the DD Act, the PAIMI Act and the PAIR Act, and alleging that Plf.'s letter of Aug. 17, 2015, cites "evidence that . . . R.W. . . . [is a] person[] with [a] disabilit[y] subject to the PAIMI, DD, and/or PAIR Acts"] *with* Hrg. Ex. 14, at 2 [attaching Plf.'s letter of August 17, 2015, page 2 of which references an "Individualized Education Program" classifying the student as "emotionally disturbed," and an "Individual Treatment Plan"

indicating that the student has diagnosis of schizophrenia] *and* Hrg. Ex. 4, at 1 [attaching an

Individualized Education Program for R.W. at the House of the Good Shepherd resulting from a

meeting on May 13, 2015, and stating, *inter alia*, that R.W.'s educational classification is

"Emotional Disturbance"] *and* Hrg. Ex. 6, at 1 [attaching an Individualized Treatment Plan for

R.W. at the House of the Good Shepherd dated April 22, 2015, stating that R.W.'s diagnoses

include "Axis I: Schizophrenia, Selective Mutism"].)

 For the reasons set forth below in Part III.B.1.b. of this Decision and Order, the Court

finds that, when these two documents are considered as part of Plaintiff's Complaint, the

Complaint alleges facts plausibly suggesting that R.W. was an individual with a mental illness.

*See, infra,* Part III.B.1.b. of this Decision and Order.

 A closer call is presented by T.H.'s Individualized Education Program at the Children's

Home of Wyoming Conference for the period of August 7, 2013, to August 6, 2014.  The

Complaint alleges that Plaintiff's letter to Defendants dated August 17, 2015, "cites to . . .

evidence that the Children's Home RTC provides supports and services to youth with

disabilities."  (Dkt. No. 1, at ¶¶ 64, 65 [Plf.'s Compl.].)  Page 2 of Plaintiff's letter of August 17,

2015, states, in pertinent part, as follows:

> Residents [of the Children's Home] . . . attend an alternative education
> program with self-contained classrooms and Committee on Special
> Education (CSE) evaluations.  The clinical issues Northeast addresses at
> the Children's Residential Treatment Center and the services it provides to
> treat those issues is evidence that this residential treatment program
> provides services and supports to children with . . . intellectual disabilities
> [and] developmental disabilities . . . .

(Hrg. Ex. 14, at 2.)  At the hearing in this action, the only Individualized Education Program for

T.H. that Plaintiff submitted was T.H.'s Individualized Education Program at the Children's

Home of Wyoming Conference for the period of August 7, 2013, to August 6, 2014.  (Hrg. Ex. 7.)  The Individualized Education Program notes that the Children's Home would be the "provider of [special education] services [to T.H.] during July and August [of 2014]."  (*Id*. at 9.)  It is difficult for the Court to imagine that Plaintiff did not have actual notice of that Individualized Education Program at the time it prepared its Complaint in February of 2016.  Moreover, the Individualized Education Program indicates that among the reasons that T.H. needed such special education services were his low intelligence quotient and "[m]ultiple [d]isabilities."  (*Id*. at 1, 3.)  As a result, for the reasons set forth below in Part III.B.1.b. of this Decision and Order, the Court finds that Plaintiff's Complaint alleges facts plausibly suggesting that T.H. was an individual with a developmental disability.  *See, infra,* Part III.B.1.b. of this Decision and Order.

Fourth, with regard to Defendants' argument regarding the HIPPA authorizations, the Court incorporates by reference the analysis set forth below in Part III.B.1.d. of this Decision and Order.  Again, the authorizations provided by Plaintiff may be considered for purposes of a Fed. R. Civ. P. 12(b)(6) analysis, because they are incorporated by reference in, and/or are integral to, the Complaint; furthermore, no dispute exists regarding their authenticity or accuracy.  (*Compare* Dkt. No. 1, at ¶¶ 4, 48, 55 [Plf.'s Compl.] *with* Hrg. Ex. 11 [containing authorizations].)  *See also, supra,* Part II.B. of this Decision and Order (setting forth legal standard governing what documents may be considered on a motion to dismiss for failure to state a claim).

Fifth, with regard to Defendants' argument regarding the naming of John Henley as an individual defendant in this action, the Court notes that the Complaint alleges that, "[a]t all times

relevant to this action, Mr. Henley [who is sued in his official capacity as chief executive officer] has exercised general responsibility, supervision, and implementation of the policies and practices of Northern Rivers Family Services and its affiliates Northeast Parent & Child Society and Parsons Child & Family Center." (Dkt. No. 1, at Caption, ¶¶ 21, 22 [Plf.'s Compl.].) Moreover, cases exist in which claims under the DD Act, PAIMI Act and/or PAIR Act have been maintained against such chief executive officers in their official capacities. *See, e.g., Conn. Office of Prot. and Advocacy for Persons with Disabilities v. Kirk*, 354 F. Supp.2d 196 (D. Conn. 2005); *Ctr. for Legal Advocacy v. Earnest, M.D.*, 320 F.3d 1107 (11th Cir. 2003); *Hawaii Disability Rights Ctr. v. Cheung*, 513 F. Supp.2d 1185 (D. Haw. 2007).

**B.      Analysis of Plaintiff's Motion for a Preliminary Injunction**

**1.      Likelihood of Success on the Merits**

After carefully considering the matter, the Court finds that Plaintiff is likely to succeed on the merits of its claims for the reasons stated in Plaintiff's memoranda of law. *See, supra,* Parts I.B.1. and I.B.3. of this Decision and Order. To those reasons, the Court adds the following analysis.

**a.      Whether Plaintiff Possesses the Unconditional Power to Monitor the Children's Home**

Before addressing the merits of Plaintiff's monitoring claim, the Court must address a threshold issue: whether Plaintiff possesses the unconditional power to monitor the Children's Home. The statutes at issue in this action unquestionably serve an extremely important (and noble) purpose: to protect children with developmental disabilities and mental illness. This is no doubt why Congress crafted the statutes the way it did. However, at the hearing, Plaintiff expressed a disturbing view of its powers.

More specifically, at the hearing, Plaintiff's Executive Director testified that, without having received a complaint, Plaintiff is entitled to enter any facility in New York State (including, but not limited to, cancer hospitals and summer camps), look around and interview its residents if Plaintiff "*perceive*[*s*]" the residents include an individual"*with a disability*." (Hrg. Tr. at 60-65 [emphasis added].) The Court will take at face value the Executive Director's testimony that there is considerable oversight of Plaintiff's activities by several government agencies, although he did not specifically identify the particular federal agency or department that oversees Plaintiff's exercise of its asserted right to unconditionally monitor Defendants. (Hrg. Tr. at 22-25, 30, 45-46, 63-64.) More troubling is that the Executive Director's broad view of Plaintiff's powers is exacerbated by the fact that the Second Circuit has held that the PAIMI Act applies to a *private home* that is neither an institution nor a facility as long as, within that home, a mentally ill person is cared for.[5] Moreover, at least one district court outside of the Second Circuit has similarly construed the DD Act.[6] Plaintiff appears to argue that it would

_____

[5]       *See State of Conn. Office of Prot. and Advocacy for Persons with Disabilities v. Hartford Bd. of Educ.*, 464 F.3d 229, 240 (2d Cir. 2006) ("[R]eading the facility-access provision as limited to residential facilities is contrary to Congress's clearly expressed intent to provide protection and advocacy services for individuals with mental illness living in their own homes."), *aff'g*,, 355 F. Supp.2d 649, 659-60 (D. Conn. 2006) ("If OPA's mandate is to protect and advocate the rights of all individuals with mental illness, regardless of whether they are treated as inpatients or outpatients, its access cannot be limited to residential facilities but must extend to all facilities treating individuals with mental illness. To exclude facilities treating individuals who live in a community setting, including their own home, would be counter to the clear language of the statute, as well as its intent.").

[6]       *See Disability Rights Washington v. Penrith Farms*, 09-CV-0024, 2009 WL 777737, at *2 (E.D. Wash. March 20, 2009) ("[B]y adding the statutory language whereby even those individuals residing in their own home fall within the jurisdiction of the [PAIMI] Act, Congress intended every case to be examined individually. The DD Act places the same emphasis on individual rights. . . .  There is no limitation placed on where these investigations take place; rather the investigatory power is couched in terms of protection of individual rights in any context. DRW is explicitly empowered to investigate allegations of abuse within a home,

never exercise its discretion in a way that it monitored or investigated such a private home, due to the limited nature of its resources. (Hrg. Ex. at 46.) However, the Court is not comforted by such an assurance by an individual. *Cf. Kent Club v. Toronto*, 305 P.2d 870, 877 (Utah 1957) (Henriod, J., dissenting) ("Our rights in property and in freedom of enterprise . . . seem to me to be too sacred and important to be guaranteed or condemned, not by our courts under proper due process assurances, but by a politician who may or may not be a saint or a tyrant . . . .").

Fortunately, after carefully reviewing the relevant case law, the Court finds that the Executive Director's description of Plaintiff's power is an overstatement. To trigger Plaintiff's monitoring power, there must exist *substantial* evidence[7] (although not *conclusive* evidence) that the service provider recently offered, or currently offers, assistance to individuals with developmental disabilities or mental illness.[8] *See, e.g.,* 42 U.S.C. § 15043(a)(2)(H) ("[S]uch [protection and advocacy] system shall . . . have access at reasonable times to any individual

---

which is clearly not a mental health institution or provider of therapeutic or psychiatric services or even a facility of any form or fashion.").

[7] In the context of Social Security law, "substantial evidence" has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009).

[8] Generally, the PAIR Act applies to persons with "disabilities" who do not have a "developmental disability" or a "mental illness." 29 U.S.C. § 794e(a)(1)(B). Such "disabilities" are defined as one of the following: "a physical or mental impairment that substantially limits one or more major life activities of such individual; . . . a record of such an impairment; or . . . being regarded as having such an impairment." 29 U.S.C. § 705(9)(B); 42 U.S.C. § 12102(1). The PAIR Act grants a P & A system the same *records*-access rights as those granted under the DD Act. *See* 29 U.S.C. § 794e(f)(2) ("[T]he eligible system will . . . have the same general authorities, including the authority to access records and program income, as are set forth in subtitle C of title I of the Developmental Disabilities Assistance and Bill of Rights Act of 2000."). However, the PAIR Act does not appear to contain a similar grant of *monitoring* rights. *See generally* 29 U.S.C. § 794e.

with a developmental disability in a location in which services, supports, and other assistance are provided to such an individual, in order to carry out the purpose of this part . . . ."); 42 U.S.C. § 10805(a)(3) ("A system established in a State . . . to protect and advocate the rights of individuals with mental illness shall–have access to facilities in the State providing care or treatment [of individuals with mental illness] . . . ."); 45 C.F.R. § 1386.27(c)(2)(ii) ("This access is for the purpose of . . . [m]onitoring compliance with respect to the rights and safety of individuals with developmental disabilities . . . ."); 42 C.F.R. § 51.42(c)(2) ("This access is for the purpose of . . . [m]onitoring compliance with respect to the rights and safety of residents [with mental illness] . . . ."); *State of Conn. Office of Prot. and Advocacy for Persons with Disabilities v. Hartford Bd. of Educ.*, 355 F. Supp.2d 649, 655 (D. Conn. 2006) ("Instead of requiring conclusive evidence that a particular person or persons qualifies as an individual with mental illness or developmentally disabled for the purposes of a protection and advocacy system's authorizing statutes, courts have held that a showing of 'substantial evidence' must suffice in order for such systems to fulfill their statutory mandate."), *aff'd*, 464 F.3d 229 (2d Cir. 2006); *cf. Office of Prot. and Advocacy for Persons with Disabilities v. Armstrong*, 266 F. Supp.2d 303, 314 (D. Conn. 2003) ("[E]vidence that a facility has previously housed individuals who are mentally ill, as well as evidence that some current residents may be mentally ill[,] is sufficient under PAMII to merit access by P & As.") (internal quotation marks omitted).[9] Here,

_____

[9]     While Plaintiff cites a decision from the Southern District of Alabama for the point of law that "P & A systems need not 'make a threshold showing' of mental illness or developmental disabilities in order to exercise their access authority" (Dkt. No. 19, at 8 [attaching page "6" of Plf.'s Reply Memo. of Law]), Plaintiff neglects to acknowledge the next sentence of that decision: "Instead of requiring conclusive evidence that a particular person or persons qualifies as an individual with mental illness or developmentally disability for the purposes of PADD, PAMII, or PAIR, courts have held that a showing of 'substantial evidence' suffices."  *Ala. Disabilities Advocacy Program v. SafetyNet Youthcare, Inc.*, 65 F. Supp.3d 1312,

this condition is significant, because whether it has been satisfied is chiefly disputed by

Defendants on this motion.  The Court will address the dispute below in Part III.B.1.b. of this

Decision and Order.

However, the Court's analysis of the scope of Plaintiff's monitoring power is not over for

the moment. This is because, during oral argument, defense counsel raised the specter of an

argument that an additional condition must be met before Plaintiff can demand to enter

Defendants' premises, look at the facility and interview its residents: the existence of (a) a report

or complaint to Plaintiff of abuse or neglect, (b) probable cause to believe that abuse or neglect

has or may have occurred, or (c) substantial evidence that there is or may be imminent danger of

serious abuse or neglect of an individual with a developmental disability.  (*See, e.g.,* Hrg. Tr. at

64-65.)

The regulations indicate that the answer to this question is no.  *See, e.g.,* 45 C.F.R. §

1386.27(c) (stating that the monitoring authority is "[i]n addition to" the investigative authority,

which is conditioned on the existence of one of the three above-listed facts).  However, the Court

construes Defendants' argument as alluding to a possible Fourth Amendment issue.

---

1322 (S.D. Ala. 2014).  Moreover, whether or not the P & A systems must "make a threshold
showing" (before it exercises its authority) is of little materiality under the circumstance: it must
certainly make a showing of substantial evidence (of mental illness or a developmental
disability) when seeking injunctive relief in court.  *Cf. Disability Rights Washington v. Rolfe,* 12-
CV-5004, 2012 WL 1409628, at *3 (W.D. Wash. Apr. 23, 2012) (denying plaintiff's motion for
a preliminary injunction because "DRW's determination of probable cause does not withstand
cursory review [by the court]"); *Iowa Prot. and Advocacy Servs., Inc. v. Gerard Treatment
Programs, L.L.C.*, 152 F. Supp.2d 1150, 1172, n.1 (N.D. Iowa 2001) ("Although IPAS may be
the 'final arbiter' of whether or not probable cause exists . . . , the court does not believe that
Gerard is barred from seeking judicial review of the sufficiency of IPAS's probable cause for its
expanded investigation.").

More specifically, an argument exists that Plaintiff is acting as an instrument or agent of the Government (whether the issue is analyzed under the public function test, the state compulsion test, the joint action test, or the symbiotic relationship test), given that (1) it possesses a mandate from the government to investigate and monitor, (2) its investigative and on-site monitoring powers appear to have traditionally been exclusively reserved to the state, (3) it appears to be funded chiefly by the government, (4) specific regulations exist setting forth the manner in which it may conduct its investigation and monitoring, and (5) it insists that there is considerable oversight of its activities by several government agencies. (Dkt. No. 1, at ¶¶ 18, 79; Hrg. Tr. at 7, 22-25, 30, 39, 45-46, 63; Dkt. No. 4, Attach. 3, at ¶¶ 6, 22 [Clune Decl.]; Dkt. No. 4, Attach. 6 [Ex. 1 to Clune Decl.]; Dkt. No. 4, Attach. 7 [Ex. 2 to Gadomski Decl.].) *See W. Va. Advocates, Inc. v. Bd. of Educ. of Monogalia Cty.*, 05-CV-0089, 2005 WL 2076620, at *2 (N.D. Wa. Va. Aug. 19, 2005) ("Whether an organization such as WVA actually is a 'state actor' may be a close question given the responsibilities of P & As under the [Developmental Disabilities Assistance and Bill of Rights Act]."); *In re Disability Rights Idaho*, 14-CV-0369, 2016 WL 878484, at *12 (D. Idaho March 7, 2016) (expressing disapproval of, but not deciding the issue presented by, DRI's argument that it is not a state agency because it is a private nonprofit, charitable 501[c][3] corporation).[10]

_____

[10]     *Cf. Ind. Protect. and Advocacy Servs. v. Ind. Family and Soc. Servs. Admin.*, 573 F.3d 548, 551 (7th Cir. 2009) ("Advocacy Services is unable to use § 1983, because Advocacy Services [as a state agency] is itself a state actor, and thus not a 'person' for the purpose of § 1983."), *modified on other grounds*, 603 F.3d 365, 379 (7th Cir. 2010) (en banc) ("[W]e decline to address IPAS's ability to pursue relief under 42 U.S.C. § 1983."); *Jones v. Cnty. of Suffolk,* 15-CV-0111, 2016 WL 614681, at *4-5 (E.D.N.Y. Feb. 16, 2016) (finding a private sex offender monitoring and verification program to be a state actor under the joint action test, because the program's monitoring operations were directed by the county police department, and the program was expressly delegated a public function through the passage of a local law).

Moreover, an argument exists that Defendants possess a reasonable expectation of privacy with regard to a warrantless, unannounced, on-site inspection of a private controlled environment (i.e., the Children's Home) and an interviewing of its residents by a relatively new *non-licensing* agency claiming "very broad" authority (i.e., Plaintiff).[11]  This is especially true where, as here, Defendants' licensing agency (the New York State Office of Children and Family Services), through what is functionally one of its investigative arms (the New York State Justice Center for the Protection of People with Special Needs), has already conducted an investigation and obtained information[12] to which the non-licensing agency has complete access.[13]  This licensing/non-licensing distinction and repetitive nature of the second inspection cannot casually be brushed aside: even if the Children's Home's business were found to be "closely regulated"[14] sufficient to qualify for the "narrow"[15] exception to the Fourth

---

[11]     (Hrg. Tr. at 9, 10, 12, 30, 89.)

[12]     (*See, e.g.,* Hrg. Ex. 16.)

[13]     *See Disability Rights New York v. Wise*, 15-CV-0032, 2016 WL 1090579, at *6 (N.D.N.Y. March 18, 2016) (Sharpe, J.) ("[D]efendants' contention that access to the entirety of information included in the reports of investigatory agencies is not essential to a P&A system's statutory mandates is contrary to the explicit language of the statutes granting P&A systems access to such reports.").

[14]     *See New York v. Burger*, 482 U.S. 691, 701 (1987) (pointing out that whether a business is "closely regulated" is "essentially defined by the pervasiveness and regularity of the . . . regulation," "the effect of such regulation upon an owner's expectation of privacy," and "the duration of a particular regulatory scheme") (intern quotation marks and citation omitted); *see, e.g., Tucson Woman's Clinic v. Eden*, 379 F.3d 531, 550-51 (9th Cir. 2015) (finding that state could not, under the closely regulated industry exception, engage in a warrantless search of an abortion provider, because the provider was not closely regulated, given the pervasiveness, regularity and duration of the regulatory scheme).

[15]     *See City of Los Angeles v. Patel*, 135 S. Ct. 2443, 2455 (2015) ("To classify hotels as pervasively regulated would permit what has always been a narrow exception to swallow the rule."); *Donovan v. Dewey*, 452 U.S. 594, 611 (1981) (Stewart, J., dissenting) ("[A]s

Amendment's warrant requirement, it could not easily be deemed to have been made aware, *through those regulations*,[16] that it would be subject to a *repetitive* inspection[17] (particularly by a non-licensing agency that came into existence *after* the regulations were put into place).[18]

The Court has carefully reviewed the relevant case law and considered the evidence. Given Plaintiff's responsibilities and its testimony that there is considerable oversight of its activities by several government agencies, the Court finds Plaintiff to be distinguishable from the P & A in *Iowa Prot. and Advocacy Servs., Inc. v. Tanager Pl.*, which the Northern District of Iowa found to not be a state actor. *Cf. Iowa Prot. and Advocacy Servs., Inc. v. Tanager Pl.*, 04-CV-0069, 2004 WL 2270002, at *15 (N.D. Iowa Sept. 30, 2004) (finding that an Iowa P&A was not an instrument or agent of the government because, *inter alia*, the government "exercised *absolutely no control* over the manner in which [plaintiff] conducted its investigation") (emphasis added), *rev'd on other grounds*, 427 F.3d 541 (8th Cir. 2005).

---

explained in [*Marshall v.*] *Barlow's*, the [closely regulated] exception is a single and narrow one: the exception applies to businesses that are both pervasively regulated and have a long history of regulation."); *cf. Marshall v. Barlow's, Inc.*, 436 U.S. 307, 313 (1978) (explaining that the "closely regulated" industry is "the exception," not "the rule").

    [16]    *See Barlow's, Inc.*, 436 U.S. at 313 ("The element that distinguishes these enterprises from ordinary businesses is a long tradition of close government supervision, of which any person who chooses to enter such a business must already be aware."); *United States v. Herrera*, 444 F.3d 1238, 1246 (10th Cir. 2006) ("An administrative search is . . . premised on the individual subject to the warrantless seizure and search knowingly and voluntarily engaging in a pervasively regulated business, and on the existence of a statutory scheme that puts that individual on notice that he will be subject to warrantless administrative seizures and searches.").

    [17]    *Cf. N.G. v. Conn.*, 382 F.3d 225, 226 (2d Cir. 2004) (concluding that "the searches conducted upon each initial entry into the custody of the State's juvenile authorities were lawful, but that *repetitive* searches, conducted while the girls remained in custody, violated the Fourth Amendment in the absence of reasonable suspicion that contraband was possessed") (emphasis added).

    [18]    *See Donovan*, 452 U.S. at 612 (Stewart, J., dissenting) ("It can hardly be said that a businessman consents to restrictions on his business when those restrictions are not imposed until *after* he has entered the business.") (emphasis in original).

Moreover, given that the search in question is to be performed not by a licensing agency but by Plaintiff, and that it is to be performed after the licensing agency has conducted a search and obtained information to which Plaintiff has access, the Court finds the privacy expectation in this action to be distinguishable from that in *Blue v. Koren,* which the Second Circuit found to be "virtually non-existent." *See Blue v. Koren*, 72 F.3d 1075, 1080-81 (2d Cir. 1995) (addressing nursing home's "virtually non-existent" right of privacy with regard to an inspection of their premises by its *licensing* agency, the New York Department of Health) (emphasis added). The Court can imagine evidence that Defendants possessed both a subjective and objectively reasonable expectation of privacy in the premises to be searched in this action.[19]

---

[19]     Of course, if Plaintiff is a state actor and Defendants possess a reasonable expectation of privacy with regard to such inspections by a non-licensing agency, then the fact that Congress authorized the search is of no consequence: Congress may not abrogate the Fourth Amendment by statute. *See* U.S. Const., art. VI, cl. 2 ("This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land . . . ."); *cf. United States v. Blocker*, 104 F.3d 720, 743 (5th Cir. 1997) (Benavides, J., dissenting) ("Pursuant to the majority opinion, the Government may now effectively circumvent the Fourth Amendment by repeatedly dispatching an administrative agent, one that it had compensated and equipped with a recording device, to search without a warrant."). However, if Plaintiff is *not* a state actor, then Congress possesses more leeway, able to abrogate the core common-law right against trespass under narrow circumstances. *Cf. Pruneyard Shopping Ctr. v. Robins*, 447 U.S. 74, 93 (1980) (Marshall, J., concurring) ("Quite serious constitutional questions might be raised if a legislature attempted to abolish certain categories of commonlaw rights in some general way. Indeed, our cases demonstrate that there are limits on governmental authority to abolish 'core' commonlaw rights, including rights against trespass, at least without a compelling showing of necessity or a provision for a reasonable alternative remedy."); *Ingraham v. Wright*, 430 U.S. 651, 673 (1976) ("The liberty preserved from deprivation without due process included the right generally to enjoy those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men. . . . . Among the historic liberties so protected was a right to be free from and to obtain judicial relief, for unjustified intrusions on personal security.") (internal quotation marks and citations omitted).

Having said all of that, the Court's imagination is not a permissible substitute for evidence.[20] Here, Defendants did not, at the hearing, adduce sufficient evidence to establish its subjective and objectively reasonable expectation of privacy in the Children's Home by a preponderance of the evidence. (*See generally* Dkt. Nos. 4, 16, 19; Hrg. Exs.; Hrg. Tr.) As a result, under the circumstances, the Court cannot preclude Plaintiff from monitoring the Children's Home based on the Fourth Amendment.

> **b.     Whether Substantial Evidence Exists that the Children's Home Recently Offered or Currently Offers Assistance to Individuals Who Are Developmentally Disabled and/or Mentally Ill (for Purposes of the Monitoring Issue)**

In support of its argument that the Children's Home recently offered or currently offers assistance to individuals who are developmental disabled and/or mentally ill, Plaintiff has adduced the following nine pieces of evidence: (1) an Individualized Education Program for T.H. at the Children's Home of Wyoming Conference for the period of August 7, 2013, to August 6, 2014, stating, *inter alia*, that, on April 19, 2013, T.H. received a psychological evaluation, which indicated that he had and/or has a Perceptual Reasoning Intelligence Quotient of 61 and a Verbal Comprehension Intelligence Quotient of 67 (Hrg. Ex. 7, at 3; Hrg. Tr. at 74-76); (2) the aforementioned Individualized Education Program for T.H. at the Children's Home of Wyoming Conference, stating, *inter alia*, that T.H.'s disability classification is "[m]ultiple [d]isabilities" (Hrg. Ex. 7, at 1, 3; Hrg. Tr. at 74-76); (3) a report of the New York State Justice Center dated August 27, 2015, stating, *inter alia*, that among the "information . . . appropriated from R.W.'s Intake Assessment dated 5/30/2014, Psychiatric Evaluation dated 6/6/2014, and Psychological

---

[20]     *See Shields v. Walt Disney Parts and Resorts US, Inc.*, 279 F.R.D. 529, 546 (C.D. Cal. 2011) ("[W]here evidence . . . is entirely lacking, the Court cannot substitute its imagination–no matter how commonsensical–in place of facts.").

Evaluation dated 6/24/2014" was information that "RW has a history of psychiatric hospitalizations at Four Winds Hospital in Saratoga . . ." and that "RW has been diagnosed with Bipolar Disorder NOS, [Post-Traumatic Stress Disorder], Oppositional Defiant Disorder, and Learning Disabilities" (Hrg. Ex. 16, at 7; Hrg. Tr. at 29-31); (4) an Individualized Treatment Plan for R.W. at the House of the Good Shepherd dated April 22, 2015, stating that R.W.'s diagnoses include "Axis I: Schizophrenia, Selective Mutism" (Hrg. Ex. 6, at 1; Hrg. Tr. at 74); (5) a medical record from Albany Medical Center, dated March 18, 2015, indicating that R.W. had a "Clinical History" of "Bipolar disorder with episodic spastic movements" (Hrg. Ex. 5; Hrg. Tr. at 73); (6) an Individualized Education Program for R.W. at the House of the Good Shepherd resulting from a meeting on May 13, 2015, and stating, *inter alia*, that R.W.'s educational classification is "Emotional Disturbance" (Hrg. Ex. 4, at 1; Hrg. Tr. at 72-73); (7) hearing testimony that Plaintiff's Executive Director Timothy A. Cune "belie[ves]" that "the Children's Home serves persons with disabilities" (Hrg. Tr. at 34-35); (8) an undated printout of an excerpt from the Children Home's website, which states, *inter alia*, that the Children's Home "typically" serves youth who "are dealing with multiple issues including . . . mental health [issues]," and that its available services include "Committee on Special Education (CSE) evaluations" (Hrg. Ex. 1; Hrg. Tr. at 34-35); and (9) a job posting, dated January 1, 2016, by the Children's Home for the position of a "Clinician" to "help[] adolescents with serious emotional, behavioral and psychiatric challenges" (Hrg. Ex. 2; Hrg. Tr. at 35-37).

The Court agrees with Defendants that several of these pieces of evidence are of little if any probative value.[21]  For example, Director Cune's belief is wholly inadmissible due to his

---

[21]    "[A] district court may, in its discretion, consider inadmissible evidence on a motion for a preliminary injunction."  *Talarico v. Excellus Health Plan, Inc.*, 14-CV-1058, 2015

lack of personal knowledge (not to mention his lack of status as an expert in diagnosing developmental disabilities). *See, e.g., ONBANCorp, Inc. v. Holtzman*, 956 F. Supp. 250, 254 (N.D.N.Y. 1997) (Pooler, J.) (disregarding those paragraphs of a declaration that were not based on declarant's personal knowledge, in deciding motion for preliminary injunction); 11A Wright, Miller & Kane, *Federal Practice & Procedure* § 2949, at 239 (2013) ("To the extent that the affiant's lack of competence to testify at trial reflects doubt about credibility, this factor also may be taken into account [on a motion for a preliminary injunction]."). Moreover, "disabilities" could well mean learning disabilities, physical disabilities or other disabilities instead of developmental disabilities. *See* 42 U.S.C. § 15002(8) (defining "developmental disability"); *Autism Soc. of Mich. v. Filler*, 05-CV-0073, 2006 WL 1519966, at *11 (W.D. Mich. May 26, 2006) ("Simply because a child receives special education services and attends an autism intervention room does not mean that the child is developmentally disabled as defined by the [DD] Act."); *cf. Armstrong v. Davis*, 275 F.3d 849, 868 (9th Cir. 2001) (recognizing that "developmental disabilities," "learning disabilities" and physical disabilities were all "different types of disability," although they could give rise to a finding of commonality for purposes of class certification), *abrogated on other grounds, Johnson v. California*, 543 U.S. 499, 504-05 (2005). Similarly, "mental health issues" are not necessarily mental illnesses. *See* 42 U.S.C. §

---

WL 2122176, at *3 (N.D.N.Y. May 6, 2010) (Suddaby, J.). However, of course, the Court need not do so; it possesses the discretion to *not* consider such evidence or to give it little weight. *See, e.g.,* 11A Wright, Miller & Kane, *Federal Practice & Procedure* § 2949, at 239 (2013)("Once received, the question of how much weight an affidavit will be given is left to the trial court's discretion and the quality of the affidavit will have a significant effect on this determination. Not surprisingly, therefore, when the primary evidence introduced is an affidavit made on information and belief rather than on personal knowledge, it generally is considered insufficient to support a motion for a preliminary injunction. Courts similarly give hearsay statements less credence than direct allegations.").

10802(4)(A) (defining "mental illness" as "a *significant* mental illness or emotional impairment, *as determined by a mental health professional* qualified under the laws and regulations of the State") (emphasis added).

However, the Court finds that, together, the first and second pieces of evidence constitute substantial evidence that T.H. had a "developmental disability" (as defined by 42 U.S.C. § 15002[8]) when he resided at the Children's Home on January 7, 2015. *Cf. United States v. Davis*, 611 F. Supp.2d 472, 476 (D. Md. 2009) (finding that "[i]ndividuals with mild mental retardation (MMR) have IQs in the range of 50-55 to approximately 70," and that "[m]ental retardation (MR) is characterized as a developmental disability"). Moreover, the Court finds that, together, the third, fourth, fifth and sixth pieces of evidence constitute substantial evidence that R.W. had a "mental illness" (as defined by 42 U.S.C. § 10802[4]) when he resided at the Children's Home on June 15, 2014, and June 19, 2014.

As a result, the Court finds that substantial evidence exists that the Children's Home recently offered assistance to an individual who is developmentally disabled and an individual who is mentally ill, thus triggering Plaintiff's monitoring power.

> **c.      Whether Substantial Evidence Exists that the Children's Home Offered Such Assistance When the Alleged Incident(s) of Abuse and Neglect Occurred (for Purposes of the Investigation Issue)**

For the same reasons that the Court finds that substantial evidence exists that T.H. had a developmental disability on January 7, 2015 (the date of his alleged abuse and neglect) and that R.W. had a mental illness on June 15, 2014, and June 19, 2014 (the date of his alleged abuse), the Court finds that substantial evidence exists that the Children's Home offered assistance to individuals who are developmentally disabled and/or mentally ill when the alleged incidents of

abuse and neglect occurred, thus triggering Plaintiff's investigation power. *See, supra,* Part III.B.1.b. of this Decision and Order.

> **d.** **Whether Defendants Could Deny Plaintiff's Requests for Access to the Records of R.W. and T.H. Based on the Insufficiency of the HIPAA Authorizations Under the Circumstances**

As indicated above in Part I.B.4. of this Decision and Order, Defendants argue that the authorizations provided by Plaintiff in May of 2014 were not compliant with HIPAA.

The regulations implementing the PAIMI Act impose a burden-shifting rule regarding authorizations, placing, on a facility requesting an authorization (from a P & A system that has demanded access to the facility's records of an individual under the PAIMI Act), the burden of providing the names of any guardians, conservators or legal representatives of the individuals whose records are being demanded:

> If a P & A system's access to facilities, programs, residents or records covered by the Act or this part is delayed or denied, the P & A system shall be provided promptly with a written statement of reasons, including, in the case of a denial for alleged lack of authorization, the name, address and telephone number of the legal guardian, conservator, or other legal representative of an individual with mental illness. Access to facilities, records or residents shall not be delayed or denied without the prompt provision of written statements of the reasons for the denial.

42 C.F.R. § 51.43.

The regulations implementing the DDA Act impose a similar burden-shifting rule:

> If a P&A system's access is denied or delayed beyond the deadlines specified in § 1386.25, the P&A system shall be provided, within one business day after the expiration of such deadline, with a written statement of reasons for the denial or delay. In the case of a denial for alleged lack of authorization, the name, address and telephone number of individuals with developmental disabilities and legal guardians, conservators, or other legal representative will be included in the aforementioned response. All of the above information shall be provided whether or not the P&A has probable cause to suspect abuse or neglect, or has received a complaint.

45 C.F.R. § 1386.26. While this particular regulation did not take effect until August 26, 2015, a prior version of the regulation existed during the time in question. *See Penn. Protect. & Advocacy, Inc. v. Royer-Greaves Sch. For Blind*, 98-CV-3995, 1999 WL 179797, at *10-11 (E.D. Pa. March 25, 1999) (quoting 45 C.F.R. § 1386.22(l) as stating, "If a [P & A] is denied access to facilities and its programs, individuals with developmental disabilities, or records covered by the Act it shall be provided promptly with a written statement of reasons, including in the case of a denial for alleged lack authorization, the name and address of the legal guardian...of an individual with developmental disabilities.").

Here, with regard to Defendants' request for a HIPPA authorization regarding R.W. (whose records were requested by Plaintiff pursuant to the PAIMI Act), the record is devoid of evidence of the above-described *written* statement of reasons from Defendants. Rather, Defendants appear to have *orally* stated by telephone on May 6, 2015, that their denial of access was based, in part, on the alleged lack of authorization under HIPAA. (Hrg. Ex. 12, at 1; Dkt. No. 4, Attach. 4, at ¶ 7 [Decl. of Gadomski].) Moreover, the record is devoid of evidence that Defendants provided the names, addresses and telephone numbers of the legal guardian, conservator, or other legal representative of R.W. (or certified that Defendants did not possess that information). (Hrg. Ex. 12, at 1; Hrg. Ex. 13; Dkt. No. 4, Attach. 4, at ¶¶ 7, 9, 15 [Decl. of Gadomski]; Hrg. Tr. at 53-56.) Finally, the written statement provided by Defendants on May 29, 2015, asserted *other* grounds for denying access: that R.W. was not an individual with a developmental disability. (Hrg. Ex. 13.)[22]

---

[22]    The Court notes that, in arguing that the authorization in question was not signed by R.W.'s legal guardian, conservator, or other legal representative, Defendants rely on the fact that the complaint in the case of *R.W. v. Northern Rivers Family Servs., Inc.*, was filed on behalf of R.W. by his mother "A.W." as "his next friend," not as his "parent and legal guardian." (Hrg.

The Court renders similar findings with regard to Defendants' request for a HIPPA authorization regarding T.H. (whose records were requested by Plaintiff pursuant to the DD Act. (Hrg. Ex. 10, at 1; Hrg. Ex. 12, at 1; Tr. at 70-72, 75, 88, 95-97.)

The Court would add only that, while woefully deficient as HIPAA authorizations, the authorizations in question (1) are typed and written in plain language, (2) identify the names of the individuals whose information is to be disclosed, (3) identify the entity to which the disclosures are to be made, (4) describe (with certain examples) the nature of the information and records to be disclosed, (5) state the dates on which the authorizations were signed, and (6) contain the signature of a woman bearing the same last name as T.H. (Hrg. Ex. 11, at 1.) Furthermore, twelve days after Defendants' requested more information on May 6, 2015, Plaintiff informed Defendants in writing that the women who signed the authorizations were R.W.'s and T.H.'s mothers. (Hrg. Ex. 12, at 1.) Finally, the record does not contain evidence that the signatories of the authorizations were not, in fact, R.W.'s and T.H.'s "legal guardian[s], conservator[s], or other legal representative[s]." (*See generally* Dkt. Nos. 4, 16, 19; Hrg. Exs.; Hrg. Tr.)

As a result, based on the record before it, the Court must reject Defendants' argument that they were justified in denying access based on the release-of-records authorizations provided by Plaintiff in May of 2015.

---

Tr. at 16, 54-55.) *See also R.W. v. Northern Rivers Family Servs., Inc.*, 15-CV-1167-GLS/DEP, Complaint, at Caption and ¶ 9 (N.D.N.Y. filed Sept. 28, 2015). However, setting aside the fact that the A.W. could have been R.W.'s "legal representative" despite the pleading, the pleading was signed on September 18, 2015–nearly nine months after A.W. signed the authorization. (Hrg. Ex. 11, at 2.)

## 2.    Irreparable Harm

After carefully considering the matter, the Court finds that Plaintiff is likely to suffer irreparable injury in the absence of an injunction for the reasons stated in its memoranda of law. *See, supra,* Parts I.B.1. and I.B.3. of this Decision and Order.  To those reasons, the Court adds the following analysis.

In support of its argument that it has made the requisite showing of irreparable harm, Plaintiff cites a district court case from within the Second Circuit.  (Dkt. No. 4, Attach. 5, at 15 [attaching page "11" of Plf.'s Memo. of Law].)  However, the case cited by Plaintiff appears to have based its finding on, among other things, the fact that probable cause existed to reasonably believe that abuse or neglect *may still be occurring. See Office of Protection and Advocacy for Persons with Disabilities v. Armstrong*, 266 F. Supp.2d 303, 310 (D. Conn. 2003) ("Connecticut P & A . . . will be irreparably harmed if it is prevented from pursuing fully its right to access records . . . in pursuit of its duty to investigate circumstances providing probable cause to believe abuse or neglect *may be occurring*.") (internal quotation marks and citation omitted).  More specifically, the reason that such probable cause existed appears to be that (1) eight inmates in the Connecticut Department of Correction had been subject to abuse and neglect (at least six of whom were mentally ill), and (2) all eight inmates died in a fourteenth month period (five of whom by suicide).  *Armstrong,* 266 F. Supp.2d at 308.  As a result, the conclusion of ongoing abuse and neglect appears to have stemmed from the unusual severity of the harm (death) and the high frequency of it (eight instances over fourteen months).  *Id*.

Here, not only is the alleged harm relatively less severe (punching, choking, and neglect at a bus stop), but it is relatively less frequent (occurring to two children in seven months).

Moreover, the children have not resided in the Children's Home for more than a year, an investigation by the Children Home's licensing agency has already occurred, the two employees alleged to have inflicted the harm have been terminated, and a lawsuit by one of the two children is pending. Under the circumstances, the Court has some difficulty in finding that a delay in enabling Plaintiff to meet its federal statutory mandate would rise to the level of irreparable harm.

However, the Second Circuit has stated that "[c]ourts have concluded that a P & A system's inability to meet its federal statutory mandate to protect and advocate for the rights of individuals with disabilities is an irreparable harm for purposes of injunctive relief." *Conn. Office of Prot. & Advocacy for Persons with Disabilities v. Hartford Bd. of Educ.*, 464 F.3d 229, 234 (2d Cir. 2006). While the Second Circuit cited a district court decision that relied on *Armstrong*, the Court has been unable to find any federal case finding no irreparable harm where a P & A system was unable to meet its federal statutory mandate.

As a result, despite Plaintiff's lengthy and unexplained delay in attempting to meet its federal statutory mandate, the Court must find that Plaintiff has made the necessary showing of irreparable harm.

### 3. Balance of Hardships

After carefully considering the matter, the Court finds that the balance of hardships tips in Plaintiff's favor (again, albeit barely) for the reasons stated in its memoranda of law. *See, supra,* Parts I.B.1. and I.B.3. of this Decision and Order. To those reasons, the Court adds three points.

First, regarding Defendants' argument that there has already been an investigation, an analogous argument has been rejected by at least one other district court. *See Wisconsin Coalition for Advocacy, Inc. v. Czaplewski*, 131 F. Supp.2d 1039, 1051 (E.D. Wisc. 2001) ("At its heart, the defendants' principal argument is that the plaintiff will not be harmed by its not being provided with the records of Mr. B. and Mr. J. because an investigation will reveal, if it has not already revealed, that the deaths of those two gentlemen were not the result of abuse or neglect. That may very well ultimately be the case. But, that does not really address the crux of the plaintiff's claim of harm. The plaintiff claims, and I agree, that the defendants' refusal to provide it with records that it is entitled to review (indeed, charged to review as a part of its responsibilities) does, in a very real and readily identifiable way, pose a threat to the plaintiff's being able to discharge its obligations.").

Second, regarding Defendants' argument that employees who allegedly abused and/or neglected T.H. and R.W. are no longer employed at the Children's Home, an analogous arguments has been rejected by the Ninth Circuit. *See Disability Law Ctr. of Alaska, Inc. v. Anchorage Sch. Dist.*, 581 F.3d 936, 939 (9th Cir. 2009) ("The district court erred in holding that probable cause under the DD Act requires some showing that abuse and neglect are ongoing or likely to recur. The fact that the offending teacher and aide had been removed from the Lake Otis classroom did not defeat Law Center's showing of probable cause.").

Third, the record does not contain evidence of the hardship to Defendants of complying with Plaintiff's requests (e.g., the time and expense of having to supervise the intrusion, the lost productivity and effectiveness of other workers in caring for troubled youths due to the interruption and distraction of the intrusion, the needlessness of the record review in light of the

investigation already conducted by New York State Justice Center, the time and expense of taking files out of use and making copies of them, etc.). (*See generally* Dkt. Nos. 4, 16, 19; Hrg. Exs.; Hrg. Tr.) On a different record, the Court might reach a different conclusion. However, it cannot do so on this record.

### 4. Public Interest

After carefully considering the matter, the Court finds that the public interest would not be disserved by the issuance of an injunction for the reasons stated in Plaintiff's memoranda of law. *See, supra,* Parts I.B.1. and I.B.3. of this Decision and Order. To those reasons, the Court adds one point.

The public interest in this case does not merely include the need for a system to look out for vulnerable children. As recognized above in Part III.B.1.a. of this Decision and Order, such a purpose is extremely important and noble. However, the public interest also includes the need to protect against unwarranted invasions of privacy. This is especially the case where such invasions are performed by entities that believe their powers are triggered by a *perception* of a disability, that are unfettered by government oversight (with respect to their monitoring and investigative powers), and that already have access to much of the information sought (through a review of the files of a licensing agency that has already performed an investigation). Having said all of that, the facts of this case do not compel a finding against Plaintiff with regard to this element of the preliminary injunction standard.

### 5. Bond

Although neither of the parties made any mention of the requirement of security for issuance of a preliminary injunction, the Court cannot ignore the requirements of Fed. R. Civ. P. 65(c).

Because Plaintiff does not appear to be either "the United States or . . . an officer or agency thereof," it does not appear to be subject to the bond requirement imposed by Fed. R. Civ. P. 65(d). *Iowa Prot. and Advocacy Servs., Inc. v. Gerard Treatment Programs, L.L.C.*, 152 F. Supp.2d 1150, 1175-76 (N.D. Iowa 2001). However, the Court finds it appropriate to waive the bond requirement in this case, because (a) neither party raised the issue, (b) it is unclear what "security" Defendants would require against an improvident issuance of the preliminary injunction, and (c) Plaintiff is a non-profit advocacy organization created by the state under federal law. *Gerard*, 152 F. Supp.2d at 1176.

As a result, no security shall be required for issuance of the preliminary injunction in this case.

**ACCORDINGLY**, it is

**ORDERED** that Plaintiff's motion for a preliminary injunction (Dkt. No. 4) is **<u>GRANTED</u>**; and it is further

**ORDERED** that the Individual Defendant's cross-motion to dismiss (Dkt. No. 16) is **<u>DENIED</u>**; and it is further

**ORDERED** that the Entity Defendants' motion to dismiss (Dkt. No. 28) is **<u>DENIED</u>**; and it is further

**ORDERED** that Defendants are **PRELIMINARILY ENJOINED** from denying Plaintiff the following, so that it may exercise its rights-and-safety-monitoring function in accordance with the DD Act and/or the PAIMI Act (and their implementing regulations), **provided** that all activities of Plaintiff are conducted so as to minimize interference with the Children's Home's programs or treatment, respect its residents' privacy interests, and honor a resident's request to terminate any interview of him or her:

(1) reasonable unaccompanied access to all areas of the Children's Home that are used by, or are accessible to, its residents;

(2) reasonable unaccompanied access to the Children's Home's programs;

(3) reasonable unaccompanied access to the Children's Home's residents;

(4) the opportunity to attend treatment planning meetings concerning individuals with developmental disabilities with the consent of the individual or his or her guardian, conservator or other legal representative; and

(5) the ability to post, in an area where individuals with developmental disabilities receive services, a poster that states the protection and advocacy services available from Plaintiff (including the name, address and telephone number of Plaintiff); and it is further

**ORDERED** that Defendants are also **PRELIMINARILY ENJOINED** from denying Plaintiff the following, so that Plaintiff may exercise its incident-investigation function in accordance with the DD Act and/or the PAIMI Act (and their implementing regulations):

(1) access to the records of R.W. and T.H. that were prepared or received by staff at the Children's Home; and

(2) the reasonable opportunity to interview any resident or employee of the Children's Home who might be reasonably believed by Plaintiff to have knowledge of the incident(s) under investigation (i.e., the incidents involving R.W. and/or T.H.); and it is further

**ORDERED** that this preliminary injunction shall be binding upon the parties to this action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of this order; and it is further

**ORDERED** that this preliminary injunction shall issue without the posting of any bond

or security by Plaintiff.

Dated:      June 2, 2016
            Syracuse, NY

_____
Hon. Glenn T. Suddaby
Chief U.S. District Judge